**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NICHOLAS COCO | : | |
| | : | |
| Plaintiff | : | |
| v. | : | |
| | : | Civil Action No. |
| CITY OF PHILADELPHIA POLICE | : | |
| DEPARTMENT | : | |
| | : | |
| Defendants | : | Jury Trial Demanded |

## CIVIL COMPLAINT

Plaintiff, Nicholas Coco, by and through his attorneys, The Derek Smith Law Group, PLLC, hereby brings this civil action pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. §12101 *et. seq.* as amended by the Americans with Disabilities Amendment Act of 2008 ("ADAA"), and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et. seq.*, and seeks relief from discrimination, disparate treatment, and retaliation related to Plaintiff's employment with Defendant, City of Philadelphia Police Department.  Plaintiff alleges and avers in support thereof:

## PARTIES

1. Plaintiff Nicholas Coco (hereinafter also referred to as Plaintiff or "Coco") is a resident of the Commonwealth of Pennsylvania.

2. At all times material, The City of Philadelphia Police Department (hereinafter referred to as Defendant or "PPD") is the police agency responsible for law enforcement and investigations within the City of Philadelphia, Pennsylvania.

## JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over this matter as it involves a Federal Question, 28 U.S.C. §1331, and the Court maintains supplemental jurisdiction, 28 U.S.C. §1367, over the state law causes of action.

4.  Venue is appropriate before this Court as all parties reside in the Eastern District of Pennsylvania and all actions and omissions giving rise to this litigation occurred in the Eastern District of Pennsylvania (i.e., Berks, Bucks, Chester, Delaware, Lancaster, Lehigh, Montgomery, Northampton, and Philadelphia).

5.  Furthermore, Plaintiff has exhausted administrative remedies by having filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), and Plaintiff having received a Notice of Right to Sue.

6.  Plaintiff's PHRA claims are still pending before the PHRC because less than one year has elapsed since Plaintiff filed his PHRA claims.

7.  Plaintiff will move to amend his complaint to assert the newly ripened causes of action under the PHRA against the parties referenced above. See Fed. R. Civ. P. 15(a) (Courts "freely give leave to amend when justice so requires".), 15(c) (Amendments "relate back" to the date of the original pleading), and 15(d) (Plaintiffs may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.").

## MATERIAL FACTS

8.  Plaintiff Nicholas Coco (hereinafter also referred to as Plaintiff or "Coco") is a resident of the Commonwealth of Pennsylvania.

9.  At all times material, The City of Philadelphia Police Department (hereinafter referred to as Defendant or "PPD") is the police agency responsible for law enforcement and investigations within the City of Philadelphia, Pennsylvania.

10. In or around September 2007 Plaintiff became employed as a Police Officer with Defendant PPD.

11. In or around December 2018 Plaintiff was promoted to the rank of Lieutenant.

12. In or around December 2021, Plaintiff began to work "Code 53 Overtime" within the 24th District.

13. At all times material, Code 53 Overtime assignments were shifts worked by officers throughout the Philadelphia Police Department wherein officers were assigned to patrol around business that contracted for security services while those officers would otherwise be scheduled as off duty.

14. Since its inception, the process for requesting Code 53 Overtime consisted of officers and supervisors signing up using a calendar that was circulated around the district.

15. Once collected, the requests would be compiled into a master sheet. If any shifts remained unfilled, the dates and times of those shifts would be circulated to officers and supervisors in an attempt to fill the vacancies.

16. At all times material, all officers were able to request Code 53 Overtime assignments so long as the contracting business owner agreed to pay rates based upon the officers' rank.

17. At all times material, Defendant was reimbursed for expenses incurred as a result of the overtime because the contracting shop owners paid for police protection.

18. To request Code 53 Overtime assignments, Officers were required to sign up using printed calendars distributed by the overtime coordinator, Sergeant Michael Hanuscin.

19. From June 2022 through August 2023, Plaintiff worked on average 91.3 hours of Code 53 Overtime.

20. During September 2023, Plaintiff worked 50.5 hours of Code 53 Overtime.

21. On or around September 24, 2023, Plaintiff contracted COVID-19 which prevented him from working the Puerto Rican Day Parade scheduled for that day.

22. At all times material, Defendant's policies and procedures mandated that Plaintiff quarantine until he could produce a negative COVID-19 test.

23. At all times material, Chief McCarrick requested a list of any individuals who were absent for any reason. Plaintiff's presence on the list given to Chief McCarrick was the catalyst for all retaliation against Plaintiff.

24. On or around September 24, 2023, Plaintiff contacted his immediate supervisor, Captain Christopher Bullick, to inform him of Plaintiff's positive COVID-19 test and need to quarantine.

25. On or around September 25, 2023, Captain Bullick responded instructing Plaintiff to obtain a "positive PCR test from a doctor or a ready care."

26. That same day Plaintiff received an email from Sergeant Hanuscin stating:

> "Per I3, All supervisors are being removed from any previous Code 53 October assignments. The Code 53 wheel is being restructured and will be offered first to officers from the entire ROC North. Once all the officers are offered shifts, then corporals and sergeants will be able to fill any that remain. As an absolute last resort, Lieutenants may request to fill any vacant positions. All officers requesting to work must be in good standing. Under no circumstances will any officer give away a shift to a supervisor without permission from Inspector Luca. Formal orders to follow from I3."

27. At all times material, Plaintiff was one of the only Lieutenants who worked Code 53 Overtime assignments.

28. Plaintiff did not understand the meaning of the phrase "good standing," and was never provided with any definition from Sergeant Hanuscin or any other supervisor.

29. Upon receipt of the email, Plaintiff contacted Sergeant Hanuscin by phone to inquire as to the reason for the sudden change in policy relating to Code 53 Overtime.

30. Sergeant Hanuscin was unable to provide any explanation for the sudden change.

31. Plaintiff told Sergeant Hanuscin that the change in policy was retaliation for Plaintiff's absence from work due to his compliance with Defendant's COVID-19 policy.

32. At all times material, Plaintiff was the only officer stripped of overtime eligibility because of his contraction of COVID-19.

33. At all times material, the inexplicable change in Defendant's policy was retaliatory and had the effect of stripping Plaintiff of income that would have otherwise been available.

34. Prior to his return to work, Plaintiff spoke with Sergeant Hanuscin on multiple occasions and requested dates for which Plaintiff could work Code 53 Overtime.

35. Each time Plaintiff contacted Sergeant Hanuscin, he was denied Code 53 Overtime assignments.

36. Sergeant Hanuscin's explanation as to why Plaintiff was unable to work Code 53 Overtime changed repeatedly.

37. First, Sergeant Hancusin blamed his superior, Inspector Anthony Luca and explained that per his orders, Code 53 Overtime assignments had to first be offered to officers, corporals, sergeants in the district, the division, then the ROC to include special units before Plaintiff could be offered any shifts.

38. At all times material, Code 53 Overtime Assignments being offered to special units was unheard of and was an attempt to prevent Plaintiff from working the assignment by any means necessary.

39. Upon his return to work on October 4, 2023, Plaintiff complied with all of Inspector Luca's directives relating to Code 53 Overtime assignments.

40. Plaintiff continued to contact his supervisors to request Code 53 Overtime assignments and was repeatedly denied.

41. Plaintiff's superiors would go to great lengths to fill any date requested by Plaintiff to be able to deny his request while leaving all other available dates unfilled with no attempt to fill those dates unless Plaintiff requested them.

42. On or around October 5, 2023, Plaintiff emailed Inspector Luca and Captain Bullick requesting a Code 53 Overtime Assignment for October 10th, 2023. Plaintiff specified that the shift remained unfilled and vacant such that there should be nothing preventing him from working the shift.

43. That same day, Inspector Luca responded to Plaintiff's inquiry stating, "Thanks for letting know it's open. I'll let you know by the 9th after we exhaust all options."

44. On or around October 6, 2023, Plaintiff received another email from Inspector Luca stating that the shift had been filled by an officer from the 26th District.

45. Upon information and belief, Inspector Luca made specific efforts to find another officer to fill the shift in an effort to prevent Plaintiff from working Code 53 Overtime assignments. Inspector Luca's efforts were in retaliation for Plaintiff's absence from work due to his compliance with Defendant's COVID-19 policy.

46. On or around October 9, 2023, Plaintiff again contacted Sergeant Hancusin regarding four unfilled Code 53 Overtime assignments.

47. Plaintiff submitted a memorandum to his Captain requesting consideration for Code 53 Overtime assignments.

48. At all times material, Officer rank is and was not a determining factor for distribution of Code 53 Overtime assignments. All officers, regardless of rank, were able to be considered for the assignments so long as the business was willing to pay the fee associated with the officer's rank.

49. At all times material, Plaintiff was never offered any shifts prior to the publication of a master list. Plaintiff was forced to request any available shifts unlike his colleagues who were offered shifts.

50. On October 11, 2023, Plaintiff received a reply to his initial request from Inspector Luca stating, "Lt. You are approved for Code 53 for the Home Depot on October 18th daywork tour. All other dates are confirmed filled by the rank of Police Officer."

51. That same day, Plaintiff received a text message from a supervisor in the 26th District, Sergeant Brandon Doris. The text message conversation showed Inspector Luca making efforts to fill the shifts Plaintiff requested two days earlier.

52. Inspector Luca was attempting to fill the shifts that Plaintiff requested to prevent Plaintiff from working Code 53 Overtime assignments.

53. On October 17, 2023, Plaintiff was conversing with an officer who had previously worked under him, Officer Daniel Switaj.

54. During their conversation, Officer Switaj informed Plaintiff that they spoke with Captain Bullick while Plaintiff was on sick leave for COVID-19.

55. Officer Switaj explained that Captain Bullick had expressed his disbelief in Plaintiff's illness and further explained that Plaintiff would no longer be permitted to work overtime as a result of his absence. Specifically, Captain Bullick stated, "it's okay we're going to take away his overtime."

56. On or around, October 25, 2023, Plaintiff contacted Sergeant Hancusin regarding his requests for Code 53 Overtime assignments in the month of November. Specifically, Plaintiff inquired as to when he could expect to learn whether he was approved to work his requested assignments.

57. Sergeant Hancusin informed Plaintiff that he would likely be denied the assignments, but that he would keep Plaintiff informed on the situation.

58. On October 27, 2023, Plaintiff followed up with Sergeant Hancusin regarding the same shifts and was informed that he had been denied per the orders of Inspector Luca.

59. On October 31, 2023, Plaintiff was speaking with Sergeant Michael Bernard regarding his difficulty obtaining Code 53 Overtime assignments.

60. During the conversation, Plaintiff inquired as to whether Sergeant Bernard was ever required to submit a memorandum to request Code 53 Overtime assignments.

61. Sergeant Bernard replied that he had never been required to submit a memorandum and that Sergeant Hanuscin called him to offer available assignments.

62. Following his conversation with Sergeant Bernard, Plaintiff began to inquire with other coworkers about whether they were required to submit memorandums to request Code 53 Overtime assignments.

63. At all times material, Plaintiff was the only officer required to submit a memorandum requesting Code 53 Overtime assignments, per Inspector Luca's order distributed on September 25th, 2023.

64. At all times material, Plaintiff was the only officer complying with Inspector Luca's order distributed on September 25th, 2023, in submitting a memorandum to work code 53 for the month of October.

65. Upon information and belief, no other personnel submitted this memorandum but were still offered Code 53 shifts while not being in compliance with the Inspectors order.

66. Further, Inspector Luca made targeted efforts to prevent Plaintiff from working overtime by seeking other officers to fill the shifts when Plaintiff had already volunteered. Inspector Luca would only make such efforts for assignments that Plaintiff requested.

67. At all times material, Inspector Luca's memorandum requirement applied solely to Plaintiff and was imposed in retaliation for Plaintiff's compliance with Defendant's COVID-19 policy.

68. Despite submitting the memorandum in compliance with Inspector Luca's directives, Plaintiff was rarely permitted to work any Code 53 Overtime assignments during the month of November despite the existence of unfilled shifts as of October 31, 2023.

69. Further, Plaintiff was only permitted to work overtime after Inspector Luca and his staff made efforts to find any other officer to work the shift.

70. On or around November 3, 2023, Plaintiff contacted Sergeant Hanuscin inquiring as to the status of an unfilled shift on November 6, 2023.

71. Plaintiff copied Inspector Luca on the email requesting the assignment.

72. Later that same day, Inspector Luca replied to Plaintiff's email stating:

> "Lt., I am not sure why I am getting direct requests for your overtime. Feel free to email Sgt. Hanuscin and CO24 your dates that you are requesting they will follow

up with my office if it can't be filled. Understanding that you just received WAWA yesterday (Nov 2) it will be very unlikely that you will get this request approved from the code 53 rotation."

73. Plaintiff was perplexed by this response, as Inspector Luca was the individual requiring Plaintiff to submit requests for Code 53 Overtime assignments for his approval.

74. Plaintiff was also perplexed as to why his receipt of the November 2nd assignment was being considered in the decision to provide Plaintiff with additional overtime assignments.

75. At all times material, other officers were never denied Code 53 Overtime assignments because they worked a shift previously. Officers' previous overtime assignments were never considered in distributing the assignments until Plaintiff made his request on November 3, 2023.

76. Following Inspector Luca's reply, Plaintiff requested that Sergeant Hanuscin keep him apprised of whether he was permitted to work the overtime assignment.

77. That same day, Sergeant Hanuscin informed Plaintiff that, "I'm not allowed to give it to you. I'm not really sure what to do. I think he's saying you have to go through the office to get approval and since it's Friday they won't have time to approve it?"

78. Plaintiff called Sergeant Hanuscin for further clarification on the issue.

79. Sergeant Hanuscin could not explain why he was not permitted to work the shift, despite it remaining unfilled.

80. Plaintiff was shocked by this response and if the scheduling supervisors were willing to allow the shift to remain unfilled rather than allow Plaintiff to work.

81. Sergeant Hanuscin replied, "It looks that way."

82. On or around November 3, 2023, Plaintiff emailed Inspector Luca inquiring as to why he was begin prevented from working Code 53 Overtime assignments. Plaintiff detailed all requests for Code 53 overtime assignments that were sent to Inspector Luca's attention and explained

that it was common for other officers and supervisors to work multiple Code 53 Overtime assignments in a four day span.

83. Plaintiff was looking for a reason why he was not being prevented from enjoying that same privilege.

84. Inspector Luca replied, stating:

> "If you feel that there is some unfairness regarding the rotation I have no other option than to cancel all Code 53 in the division until this gets worked out when I get in the office on Monday. My order was explicit as to where any request was suppose to go. My office was left to fill the remaining spots that Sgt. Hanuscin could not fill. Any further question on overtime for a Lieutenant can go directly to Labor Relations unit or if you feel to contact the union to get Code 53 questions answered the number is 215 629 3600. As of Monday, all Code 53 will be suspended until further notice. No more hurdles and no more confusion. I'll let Sgt Hanuscin and Captain Bullick know."

85. Plaintiff did not reply to Inspector Luca's email.

86. That same day, the entire Division received an email from Inspector Luca stating that all Code 53 Overtime assignments had been suspended.

87. Inspector Luca's decision to suspend Code 53 Overtime was direct retaliation for Plaintiff's email regarding unfair assignment distribution and made with the intent to vilify Plaintiff in the eyes of his coworkers.

88. On or around November 7, 2023, Plaintiff received an email from Captain Bullick re-instituting the Code 53 Overtime assignment program.

89. However, Plaintiff was still the only officer who was required to submit a memorandum to request overtime assignments.

90. Further, Plaintiff remained the only officer who was required to obtain approval from an Inspector to be permitted to perform overtime work.

91. After Plaintiff brought this to Captain Bullick's attention, Inspector Luca began requiring all personnel to submit memoranda in order to be considered for Code 53 Overtime assignments.

92. Since the reinstitution and actual enforcement of the Code 53 Overtime policy, Plaintiff has retaliatorily been prevented from working other overtime assignments that he would otherwise be permitted to work but for his absence due to illness.

93. Specifically, Captain Bullick has refused to allow Plaintiff to work Code 64 Overtime during the month of January 2024 in retaliation for Plaintiff's complaints regarding unfair distribution of Code 53 Overtime assignments.

94. The above shows a clear concerted effort by Captain Christopher Bullick, Inspector Anthony Luca, and Chief Michael McCarrick to retaliate against Plaintiff for contracting COVID, a medical condition which was verified by my doctors note that Plaintiff produced upon my return to work per departmental policy.

95. Plaintiff continues to be denied permission to work Code 53 Overtime assignments thereby stripping him of income he would otherwise be permitted to receive.

96. The above are just some examples of some of the discrimination and retaliation to which Defendants subjected Plaintiff to on a continuous and on-going basis throughout Plaintiff's employment.

97. The Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

98. Plaintiff claims alternatively that Plaintiff is an Independent Contractor, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiff claims that Defendant owed and

breached its duty to Plaintiff to prevent the harassment, discrimination, and retaliation and is liable therefore for negligence.

99. Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

## COUNT I
### Disability Discrimination in Violation of
### The Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq.*
### *(Plaintiff v. City of Philadelphia Police Department)*

100. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

101. The ADA prohibits discrimination on the basis of a disability, and provides:

**(a) General rule**
No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*42 U.S.C. § 12112(a).*

102. At all times material, Plaintiff was a qualified individual with a disability entitled to the protections of the ADA.

103. At all times material, Defendants had actual knowledge of Plaintiff's status as a qualified individual disability entitled to the protections of the ADA.

104. At all times material, Plaintiff's disability status was the and/or a motivating and/or determinative factor in Defendants' decision to terminate Plaintiff employment.

13

105.   Defendants' decision to terminate Plaintiff because of Plaintiff's disability status was intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

106.   Defendants' decision to terminate Plaintiff's employment because of Plaintiff's disability is an unlawful employment practice in violation of the ADA.

107.   As a direct and proximate result of Defendants' unlawful termination of Plaintiff's employment in violation of ADA, Plaintiff has suffered and continues to suffer emotional and financial harm.

## **COUNT II**
**Retaliation in Violation of**
**The Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq.***
*(Plaintiff v. City of Philadelphia Police Department)*

108.   Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

109.   Section 503 of the ADA prohibits retaliation, and provides:

**(a) Retaliation**
No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

*42 U.S.C. § 12203(a).*

110.   Plaintiff engaged protected activity under the ADA including, but not limited to:

   a.   Plaintiff informed Defendant of his disability;
   b.   Expressing opposition to Defendants' unlawful employment practices.

111.   Plaintiff's prior protected activity and/or opposition to Defendants' unlawful employment practices was the motivating and/or determinative factor in Defendants' decision to

constructively terminate Plaintiff's employment requiring Plaintiff's resignation on April 5, 2022.

112.   The temporal proximity between Plaintiff's protected activity and Defendants' decision to take materially adverse employment action against Plaintiff is unusually suggestive of a retaliatory motive and gives rise to an inference of causation.

113.   Defendants' unlawful and hostile actions constituted unlawful retaliation for Plaintiff's prior protected activity and/or opposition to Defendants' unlawful employment practices, was intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

114.   Defendants' unlawful and hostile actions taken resulting in Plaintiff's constructive termination on April 5, 2022 in retaliation for Plaintiff's prior protected activity is an unlawful employment practice in violation of the ADA.

115.   As a direct and proximate result of Defendants' retaliatory constrictive termination of Plaintiff's employment in violation of ADA, Plaintiff has suffered and continues to suffer emotional and financial harm.

**<u>COUNT III</u>**
**Unlawful Interference in Violation of**
**The Americans with Disabilities Act, as amended, 42 U.S.C. § 12101,** *et seq.*
***(Plaintiff v. City of Philadelphia Police Department)***

116.   Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

117.   Section 503 of the ADA prohibits interference, coercion, and intimidation, and provides:

**(b) Interference, coercion, or intimidation**

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged

any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

*42 U.S.C. § 12203(b).*

118.     At all times material, Plaintiff was a qualified individual with a disability entitled to the protections of the ADA.

119.     At all times material, Defendants had actual knowledge of Plaintiff's status as a qualified individual with a disability entitled to the protections of the ADA.

120.     Defendants' actions to shirk its duties to Plaintiff under the ADA as alleged in this Complaint are unlawful interference in violation of the ADA.

121.     As a direct and proximate result of Defendants' unlawful interference in violation of ADA, Plaintiff has suffered and continues to suffer emotional and financial harm.

### JURY DEMAND

PLAINTIFF demands a jury trial on all issues to be tried.

### DEMAND TO PRESERVE EVIDENCE

The Defendants are hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to his potential claims, his claims to damages, to any defenses to same, including, but not limited to electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in this litigation.

### PRAYER FOR RELIEF

**WHEREFORE**, PLAINTIFF demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages, liquidated damages, statutory damaged, attorney's fees, costs, and disbursement of action; and for such other relief as the Court deems just and proper.

Date: <u>May 3, 2024</u>                    **DEREK SMITH LAW GROUP, PLLC**

By: _/s/ Timothy J. Prol, Esq.__
Timothy J. Prol, Esq.
1628 Pine Steet
Philadelphia, Pennsylvania 19103
Phone: (215) 391-4790
tim@dereksmithlaw.com
Attorneys for Plaintiff, Nicholas Coco